## In re AMINO ACID LYSINE ANTITRUST LITIGATION.

### (This Document Relates to All Actions).

No. 95 C 7679 [1].
MDL No. 1083.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 18, 1996.

Bailey, Harring & Peterson, James S. Bailey, Jr., Denver, CO, Bainbridge & Straus, Philippa McC. Bainbridge, Michael Straus, Birmingham, AL, Berger & Montague, P.C., David Berger, Merrill G. Davidoff, Philadelphia, PA, Boies & McInnis, Mary Boies, Mac McInnis, Bedford, NY, Louis F. Cainkar, Ltd., Michael G. Cainkar, Chicago, IL, Cohen, Milstein, Hausfeld & Toll, Michael D. Hausfeld, Washington, DC, Daughtry, Woodard, Lawrence & Starling N. Leo Daughtry, Smithfield, NC, Duane Morris & Heckscher, Michael M. Baylson, Elise E. Singer, Philadelphia, PA, Duker & Barrett, L.L.P., William F. Duker, Kathryn L. Bedke, Kenneth G. Alberstadt, New York City, Dyer, Donnel-

---

2. That would certainly include following *Stromberg*'s teaching in this case *if* it were relevant—as it is not.

1. Until now all filings in connection with this litigation that have not focused on fewer than all of the included actions have carried the number 95 C 4587, the number of the lowest-numbered individual action filed in this District. Because the Clerk of Court has now assigned number 95 C 7679 to the Master Docket in the cases comprising the overall MDL proceedings, all future orders, opinions and parties' filings shall be captioned and numbered in the same manner as this opinion *unless* they relate only to a constituent case or cases (and Paragraphs IA, II, and VI of "Order No. 1" referred to later in the text are modified accordingly). All prior filings under the 95 C 4587 number that relate to the overall proceeding will also be deemed to have been filed under the 95 C 7679 number and caption.

ly & Lilley, James Donnelly, Denver, CO, Fine, Kaplan & Black, Allen D. Black, Jeffrey S. Istvan, Philadelphia, PA, Freedman, Boyd, Daniels, Peifer, Hollander, Guttmann & Goldberg, Joseph Goldberg, Albuquerque, NM, Gilman and Pastor, Kenneth G. Gilman, David Pastor, Boston, MA, Goodkind Labaton Rudoff & Sucharow, L.L.P., Lawrence Sucharow, Bernard Persky, Barbara Hart, New York City, Heins Mills & Olson, P.L.C., Samuel D. Heins, Stacey L. Mills, Karla M. Gluek, Minneapolis, MN, Keller Rohrback, Lynn Lincoln Sarko, Seattle, WA, Kohn, Swift & Graf, P.C., Harold H. Kohn, Robert A. Swift, Joseph C. Kohn, Philadelphia, PA, Kost & Kost, Keith K. Kost, Lewiston, IL, Levin, Fishbein, Sedran & Berman, Howard J. Sedran, Philadelphia, PA, Lieff, Cabraser, Heimann & Bernstein, Robert Lieff, San Francisco, CA, Meredith Cohen & Greenfogel, P.C., Joel C. Meredith, Philadelphia, PA, Much Shelist Freed, Denenberg & Ament, P.C., Michael J. Freed, Steven A. Kanner, Chicago, IL, Reaser & Wall, Vernon Reaser, Victoria, TX, Reinhardt & Anderson, Mark Reinhardt, St. Paul, MN, Ritchie & Rediker, J. Michael Rediker, Thomas R. Krebs, Birmingham, AL, Robert B. Silver & Associates, Robert B. Silver, New York City, Specks & Goldberg, Granvil I. Specks, Perry Goldberg, Chicago, IL, Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, Robert C. Pahlke, Scottsbluff, NE, Watson, Fees & Jimmerson, P.C., Herman Watson, Jr., Michael Fees, Huntsville, AL, Cochrane & Bresnaham, St. Paul, MN, Chestnut & Brooks, Minneapolis, MN, Rohan, Goldfarb & Shapiro, P.S., Seattle, WA, Levy, Angstreich Finney Baldante Mann & Burkett, Philadelphia, PA, Wiest, Wiest, Saylor & Muolo, Robert J. Muolo, Sunbury, PA, Bracewell & Patterson, L.L.P., Houston, TX, Blumenfeld, Kaplan & Sandweiss, P.C., John Blumenfeld, St. Louis, MO, Charles H. Johnson & Associates, Charles H. Johnson, New Brighton, MN, Specks & Goldberg, Perry Goldberg, Chicago, IL, for Plaintiffs.

Ross & Hardies, P.C., Timothy C. Klenk, Richard J. Rappaport, Alison C.B. Laing, Patricia Klein Smoots, Amy Beth Manning, Chicago, IL, Williams & Connolly, Aubrey M. Daniel, III, John E. Schmidtlein, Williams & Connolly, Washington, DC, for Defendant A.D.M.

McDermott, Will & Emery, David Marx, Anne R. Pramaggiore, Chicago, IL, for Defendant Heartland Lysine.

Hopkins & Sutter, P.C., Mark Crane, Antony S. Burt, Chicago, IL, for Defendant BioKyowa, Inc.

Weil, Gotshal & Manges, A. Paul Victor, Debra J. Pearlstein, Steven Alan Reiss, New York City, for Defendant BioKyowa.

Law Offices of Vito R. Vincenti, P.C., Vito R. Vincenti, New York City, for Defendant Sewon America, Inc.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This Court originally received the first-filed of these prospective class actions in this District Court (*K & L Feeds, Inc. v. Archer Daniels Midland Co., Inc.*, 95 C 4587) via reassignment by the Executive Committee from the calendar of this Court's colleague Honorable George Lindberg. Next the four other cases that were later filed in this District Court[2] were reassigned to this Court's calendar (also from Judge Lindberg's calendar) on grounds of relatedness under this District Court's General Rule 2.31. Then, as had been regarded a likely possibility, on December 15, 1995 the Judicial Panel on Multidistrict Litigation ("MDL Panel") transferred MDL–1083, *In re Amino Acid Lysine Antitrust Litigation*, to this Court under 28 U.S.C. § 1407. That transfer carried with it, in addition to the *K & L Feeds* and *General Utility* cases, three cases from other districts.[3] In the only other case reassignment

---

**2.** *General Utility Co. v. Archer Daniels Midland Co.* (95 C 4898), *Kreamer Feed Store, Inc. v. Archer Daniels Midland Co.* (95 C 5363), *A.J. DeCoster Co. v. Archer Daniels Midland Co.* (95 C 5938) and *Consumers Supply Corp. v. Archer Daniels Midland Co.* (95 C 5940).

**3.** *Brown v. Archer Daniels Midland Co.*, N.D.Ala. Case No. 4:95–2074; *Walker Farms, Inc. v. Arch-*

that has taken place up to now, on December 26 the MDL Panel entered a conditional transfer order to bring two more cases from the Northern District of Alabama[4] into the group.[5]

Before the transfer from Judge Lindberg, at the behest of plaintiffs' counsel he had entered Pretrial Order No. 1 (Initial Case Management Order) ("Order No. 1")—an order of the type provided as a sample in the Manual for Complex Litigation (3d). In part Order No. 1 ¶ 10 designated lead counsel for the entire set of cases. But by definition not all of the relevant players had the opportunity to provide input for that determination. And at least as importantly, from the time of its initial receipt of this litigation this Court was concerned that the best interests of the putative plaintiff class would not be served by the kind of proliferation of plaintiffs' counsel that ordinarily marks a like proliferation of the number of cases that so often spring up after a triggering event—whether in the field of securities law or (as here) in the antitrust area or in some other area potentially ripe for class treatment.

■ This Court therefore advised counsel that, as it had presaged five years ago in the context of its dealing with fee requests from ten sets of lawyers in a just-settled group of securities class actions (*In re Telesphere Sec. Litig.*, 753 F.Supp. 716, 721 (N.D.Ill.1990)), it would give serious consideration to the possibility (1) of obtaining sealed bids from any interested law firms and (2) of then designating the class counsel based on those bids.[6] To that end this Court ordered the contemporaneous filing of such bids and of submissions from any interested parties as to the desirability or undesirability of employing that bidding procedure rather than some other approach to the appointment and compensation of class counsel.

Eight sets of lawyers have responded by tendering bids under seal.[7] And five submissions have been made (two of those were included as part of the bids) as to the desirability or undesirability of following the bidding procedure. As a logical matter the latter subject will be addressed at the outset, for if a negative answer were given to that question the bids would become moot and would simply be returned to the respective bidders—still under seal.

### Bidding Vel Non

One of the submissions in opposition to the use of a bidding procedure frankly borders

---

er Daniels Midland Co., C.D.Ill. Case No. 2:95–2186; and *Munco, Inc. v. Archer Daniels Midland Co.*, C.D.Ill. Case No. 2:95–2203.

4. *Horizon Laboratories, Inc. v. Archer Daniels Midland Co.*, N.D.Ala. Case No. 2:95–2198 and *Ashley v. Archer Daniels Midland Co.*, N.D.Ala. Case No. 4:95–2304.

5. Only *K & L Feeds* and *General Utility*, the first two cases filed in this District Court, were pending when the motion for MDL designation was filed with the MDL Panel. For that reason the three highest-numbered cases filed initially in this District Court (*Kreamer Feed, DeCoster* and *Consumers Supply*), although they had already been reassigned to this Court's calendar, were not included within the MDL Panel's orders. This Court has requested the MDL Panel to take appropriate action in that respect.

6. As *Telesphere, id.* reflected and as is well known to all practitioners who are at all active in class action litigation, District Judge Vaughn Walker of the Central District of California is the first federal judge to have adopted that procedure. To date he has had occasion to employ it in several cases, although this Court is unaware of

any other courts that have done so at all. But as this opinion reflects, the factors favoring such an approach are compelling under the circumstances here.

7. One of the questions that had been asked by counsel during the two status hearings at which the bidding process was discussed was whether it would be in order for counsel (other than those who had already affiliated themselves together in one of the existing lawsuits) to submit a joint bid, or to discuss aspects of the bidding among themselves. In candor this Court found that request more than somewhat ironic in this litigation, finding its origin as it does in the antitrust laws, because any such cooperation among counsel that could cut back on the number of prospective bidders or could otherwise inhibit the independent judgment of those who bid would clearly seem to operate in restraint of trade. In order to maximize competition in the best interests of the prospective plaintiff class, this Court has barred any joinder or any communications of the nature that were referred to in counsel's questions. Judging by the results—fully eight bids proffered by independent and well-qualified bidders—it would appear that the goal of free market competition in the best interests of the plaintiffs was indeed attained.

on the absurd—the memorandum that is signed by Perry Goldberg, Esq. of Specks and Goldberg, filed on behalf of the six firms (counsel for plaintiff in the *Consumers Supply* lawsuit) that have joined in the bid shown as headed by Reinhardt & Anderson. In principal part attorney Goldberg and his cohorts advance the position that a competitive bidding process "violates Supreme Court precedent," specifically *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

That flawed notion stems from the bizarre idea that an up-front bidding process is somehow at odds with the need for the court to make a finding as to the extent of plaintiffs' success in the litigation. Of course *Hensley, id.* at 434–37, 103 S.Ct. at 1940–41 spoke of the need for a court to examine such success in order to make the dramatically different determination whether a lodestar calculation—reasonable hours times a reasonable rate—produces a reasonable fee. By sharp contrast, here the bid that was actually submitted by the group of counsel who have also tendered the objection now under discussion, like all of the other bids received by this Court (with one possible exception discussed later), is itself already solely and directly geared to the level of plaintiffs' success—for it expressly predicates the amount of the fee on a percentage-of-recovery formula (rather than a lodestar or enhanced lodestar calculation or some other methodology). It was after all entirely within the discretion of all bidding counsel to decide just how they would formulate their proposals, and what all of them have chosen to submit (just as this Court had expected) clearly calls for the summary rejection of that objection.

Another of the statements as to whether this Court should employ the bidding process (the one submitted as part of the bid tendered by the three firms headed by Heins, Mills & Olson, counsel for plaintiff in the *Munco* action originally filed in the Central District of Illinois) favors that process so long as the selection criteria include considerations of quality rather than simply being limited to the cheapest bid:

Competitive proposals to serve as lead counsel for the plaintiff class may be beneficial to the plaintiff class in this antitrust action provided that the selection criteria include qualitative factors affecting representation of the class, as well as attorneys' fees that would be charged by proposed lead class counsel. *See In re Wells Fargo Sec. Litig.,* 157 F.R.D. 467 (N.D.Cal.1994).[8] If the proposals to serve as lead counsel address qualitative factors that proposed lead counsel will bring to bear to the litigation such as their experience, knowledge, reputation, and ability to finance the litigation, as well as a proposal for fees and expenses, submission of proposals to represent the class will put the emphasis where it properly belongs—on the best interests of the class.

That has indeed been this Court's expected approach from the beginning if it were to consider following the bidding concept. Nothing that this Court has either said or implied during its two oral discussions of the subject with counsel for all the parties could fairly be understood as suggesting otherwise.

That then leaves for discussion the three submissions that voice other criticisms of the bidding process—one by the four law firms acting as counsel in the *Walker Farms* case (for convenience that is referred to as the "Simon Memorandum," because it is signed by Leonard Simon of the Milberg Weiss firm), another by the three law firms acting as counsel for plaintiffs in the five cases filed in this District Court in the first instance (for convenience that is referred to as the "Freed Memorandum," because it is signed by Michael Freed of the Much Shelist firm) and the third, which reflects "a few reservations concerning the efficacy of the auction process" and which accompanied the bid by the three law firms acting as counsel in the *Horizon Laboratories* case (for convenience that is referred to as the "Davidoff Memorandum," because it is signed by Merrill Davidoff of the Berger & Montague firm). This Court has also considered all of those submissions and finds them wanting, not because (unlike the first one mentioned earlier)

**8.** [Footnote by this Court] *Wells Fargo* is the second of the cases in which Judge Walker has utilized a bidding procedure to decide on class counsel.

they lack in thoughtfulness but because they operate from essentially false premises.

If these were typical lawsuits—with one party (or more than one party acting jointly) suing one or more defendants—the free market process by which each client or set of clients chooses its own lawyer would of course control. Every client makes that choice on the predicate that the lawyer chosen is the best possible choice under all the circumstances, and the courts do not interfere with such choices just because clients are often wrong in those judgments. But the difficulty comes when a lawyer who is *not* of one's choosing is foisted on one, as is inevitable in the class action context. And the fact that the putative class representative who brings an action has chosen a particular lawyer (or vice versa, as everyone knows is frequently the case in the real world) gives no assurance—or even presumptive assurance—that the selected lawyer is the best choice for the absent class members. In that situation, unlike the one-on-one situation where the court properly stays out of the decision-making process, the analogy of the direct market breaks down and only the court can bring objectivity to bear on the issue.

It is worth repeating what this Court said in *Telesphere*, 753 F.Supp. at 719—albeit made in the different context of passing on the reasonableness of requested hourly rates, the point that was made there is equally valid for present purposes:

> When clients choose their own lawyers, the free market operates—whether or not the bargain is made on the basis of truly full information,[5] it reflects an agreement between a willing buyer and willing seller of legal services. But in the stockholders' class action it is the lawyers who choose themselves for all practical purposes [6]— true enough, there is a one-to-one relationship between the lawyer and the individual class representative, but that relationship cannot equate to a bargained-for retainer by the entire class.

[5] All lawyers know that the client is rarely if ever equipped to make a fully informed judgment in selecting counsel. Legal services (and lawyers themselves) are not fungible, and the choice of counsel always implicates a host of intangible factors—almost never a bidding in terms of price (but see n. 10). Indeed, in terms of the subjective factors that enter into the choice of counsel, most clients go to their lawyers because the client believes the lawyers are the best in town—and we know that the clients can't *all* be right in making that judgment.

[6] One need not be a total cynic, or subscribe entirely to the scenario portrayed as to the origin of a class action in Shelby Yastrow's current novel *Undue Influence*, to understand that such lawsuits in the securities field most often either begin with the lawyer or, if not, derive their main impetus from the lawyer.

Hence the court must stand in the position of an intermediary acting for the class members in establishing rates.

And as our Court of Appeals has said in that same context (*In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992)):

> The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible. In other words the object is to simulate the market where a direct market determination is infeasible. It is infeasible in a class action because no member of the class has a sufficient stake to drive a hard—or any—bargain with the lawyer. So the judge has to step in and play surrogate client.

To be sure, both the Simon and Freed Memoranda make the point that this is not like (for example) the class action involving small consumer claims, in which no individual plaintiff has a meaningful stake. Although none of the complaints has quantified the amount of lysine purchased by, or the potential damages suffered by, the respective named plaintiffs, some of the submissions by counsel have indicated that really substantial numbers are involved, so that it is not literally true that "no member of the class has a sufficient stake to drive a hard—or any— bargain with the lawyer." But the identical principle applies nonetheless, because an individual named plaintiff—who may be assumed to be perfectly competent to make judgments for itself and to have the necessary economic interest and leverage to do that—cannot fairly be permitted to impose its own determination, made on its own be-

half, as a decision that automatically will bind every other lysine consumer (many of whom are also major buyers) in what has been described as a lawsuit that may involve as much as hundreds of millions of dollars.

Indeed, the argument that the objecting counsel seek to make on that basis really breaks down even on its own terms. All but one of the bidding law firms has in fact been selected by a presumably well informed client that is a named plaintiff in one of the lawsuits.[9] If that is indeed a rational judgment about the quality of the law firm or firms involved, an award to one of the firms or sets of firms so selected—an award predicated on the basis on which that firm or set of firms is prepared to handle the litigation—provides the best possible outcome. Hence the inapplicability to the current situation of the second to the last sentence quoted earlier from *Continental Illinois* does not at all derogate from the appropriateness of competitive bidding in this litigation.

It is thus ironic that Simon Memorandum at 1 quotes the same *Continental Illinois* language that forms the first two sentences of this opinion's quotation from that case, and that in so doing the Memorandum underscores our Court of Appeals' reference to "simulat[ing] the market." That irony is particularly poignant in light of the fact (discussed a bit later) that the alternative suggestion in the Simon Memorandum does not at all "simulate the market" in any effective way.

It should be emphasized that all of the references in the Simon and Freed Memoranda to the undesirability of selecting counsel based on price alone truly raise a straw man. Not for a moment has this Court considered the possibility of basing the choice of counsel on the money factor itself. This Court has always recognized full well that it is essential to choose counsel who have impeccable credentials in terms of ability and experience.

In that respect it is interesting that the Freed Memorandum urges this Court to adhere to Order No. 1, with its designation as lead counsel of the three firms submitting that memorandum. In the course of that presentation the Freed Memorandum understandably emphasizes that the designated lead counsel are highly qualified and experienced in large complex cases such as these. This Court certainly has no reason to doubt that—and the fact that one of those three firms, with demonstrated excellent qualifications (see Freed Mem. 21–24 and the firm resume at Ex. H), turns out to be the successful bidder tends to reinforce (rather than in any way to impeach) the propriety and utility of the bidding procedure.

What the Simon Memorandum urges instead is that this Court should select the lead counsel in terms of quality ("the best counsel available"—Mem. 5) and should then negotiate a binding fee arrangement "that the Court feels is reasonable" (*id.*). In that respect the second suggestion (but not the first) has the support of the work product generated by the distinguished Third Circuit Task Force appointed to address the subject described by that group as *Court Awarded Attorney Fees,* 108 F.R.D. 237, 255–57 (1985).

But as already indicated, the Task Force was not called upon to deal with the subject now under discussion. Its report simply does not address the question of selection among a number of qualified firms that are ready, willing and able to represent the plaintiff class, a task for which a court is not at all well suited (counsel's argument really ignores the critical distinctions between a real client and the court as pseudo-client). With a substantial number of highly credentialed and highly experienced lawyers available (as is demonstrated by the identity and curriculum vitae of the bidders here), the choice of which of them is primus inter pares reduces to a highly imperfect one, necessarily partaking of subjective and personalized factors. To require a court to make that choice without reference to the economics— what level of compensation are the different available and well-qualified counsel willing to work for?—does *not* simulate what the informed client would do.

9. That one exception comes from a bidding group that represents that it has two clients who have authorized the filing of a similar lawsuit.

As for the suggestion that the Task Force *does* make, that the determination of a compensation plan for the lawyers who are already class counsel should be "negotiated in an open and appropriately arms-length manner" (108 F.R.D. at 256), something that "particularly in complex cases ... probably should not be undertaken by the district judge who will hear the case" (*id.*) but rather by an attorney appointed for that task, that too does not simulate reality in a manner that even approaches that afforded by a bidding process. Indeed, the example that counsel have cited—*ACC/Lincoln Sav. Sec. Litig.*, MDL 834 (D.Ariz.), a case in which the court's July 25, 1990 fee order provided that plaintiffs' attorneys were to receive 25% of the first $150 million recovered and 29% of any excess recovery over that figure—really strikes this Court as an extraordinarily bad deal. And lest that be viewed as an uninformed subjective reaction, it is perhaps best demonstrated by the fact that *only one* of the eight bids in this litigation (and, under some circumstances, perhaps a second bid) would require the plaintiff class to give up that much of its recovery in order to create an appropriate incentive for good aggressive lawyering by its counsel. All of the others assure a far better economic outcome for the class out of any recovery.

Similarly, the other example that has been provided of an effort to implement the Task Force's recommendations (the report of Special Master C. Harold Schwartz in *In re U.S. Surgical Corp. Sec. Litig.*, 92 CV 374 (D.Conn. Oct. 27, 1993), reproduced as Ex. C to the Freed Memorandum) certainly reflects a good faith effort by the Special Master to act as the "surrogate client." But it just as surely produces an unsatisfactory substitute for bidding, under which the court knows the *best* deal that a qualified firm is prepared to make, submitted at a time when the firm knows that other qualified and competing firms are also tendering their own proposed best deals. If we truly want to simulate the market, the bidding process does so in a way that the best-intentioned efforts along the lines suggested by the Task Force and sought to be implemented by Special Master Schwartz cannot do.

Just a bit should be said at this point about the "few reservations concerning the efficacy of the auction process" voiced in the Davidoff Memorandum. Though both thoughtful and thought-provoking, this Court finds them unpersuasive as reasons for not pursuing the competitive-bid avenue:

1. As already mentioned, it is true that these actions differ from (say) consumer class actions because the putative class consists primarily of business entities. It is of course then possible that businesses (as presumptively more sophisticated clients) might "vote with their feet" by opting out of the class, but it would seem that the combination of well-qualified class counsel and economies of scale would militate against that prospect.

2. As to any notion that "The Auction May Not Adequately Reflect Ex Ante Risks," knowledgeable law firms are well qualified to make that sort of decision every day in establishing fee arrangements with their own clients. And perhaps the best demonstration of the workability of this exercise of free market principles is in the actual bids that have been generated here.

3. Two other objections are interposed to the possible conflict with the client class' best interests that may be created by fixed percentage fees (and possibly by an inordinately low bid in that respect). But those objections are really just another aspect of the seldom-acknowledged fact that lawyers and their clients often have built-in conflicts when it comes to fees. In that respect the system relies on the professionalism and the ethical responsibilities of counsel to honor their fiduciary obligations to their clients—and in any event, in the current situation the court remains available as a monitor.

But to return to the Simon and Freed Memoranda, it is really unnecessary to prolong this aspect of the opinion further. This Court's always-held intention to make the quality of representation an integral part of the decisional process places most of the remaining arguments offered by those two memoranda into the straw man category. It is however worth mentioning, if only in pass-

ing, the mischaracterization at Freed Mem. 10–11 of the proposal that has been made in a few law review articles for auctioning off the class' *cause of action itself.* That concept is of course dramatically different from leaving the ownership of the cause of action in the clients, while utilizing the bidding process only to determine the compensation to be paid to the otherwise qualified counsel who will represent the class.

In summary, this Court's careful examination of all of the considerations involved— both those raised by the objecting counsel and those that have occurred to this Court on its own—leaves it with the firm conviction that the bidding concept ingeniously devised by Judge Walker a number of years ago fits the present situation extraordinarily well. If this opinion has not expressly addressed any of the nuances that have been tendered by objecting counsel, that has not been for lack of consideration, but only because further discussion would do no more than to "gild refined gold" or "paint the lily." [10]

### Economic Comparison of Bids

It is time then to turn to the several bids to determine the identity of the class representative. Some are so obviously out of any competitive range that only a few words of comment are needed, while others require more detailed discussion. Because any sequence chosen for the discussion would necessarily be arbitrary, this opinion will simply take them in the alphabetical order of the lead firms submitting the bids (and for convenience of discussion, those firms will be referred to in the text solely by the name of the first named partner in the firm).

*Berger & Montague, P.C., Counsel in the* Horizon Laboratories *Case* [11]

This is the most complex bid requiring meaningful discussion, because its structure makes comparison with other bids difficult. Accordingly this initial treatment will simply outline the bid's basic approach, deferring more particularized discussion to a comparison with the Kohn bid, the other potential finalist.

What Berger has done is to establish staged percentages based on the date when settlement or final judgment is reached. That begins with 9.65% of the recovery if that occurs during the first 12 months after appointment of counsel, continuing with 14.4% or 16.4% during the next six months (depending on whether the recovery comes before summary judgment practice or trial), and then with 19.4% or 21.8% on like contingencies during the six-month interval after 18 months but fewer than 24 months have elapsed. Finally, any outcome more than 24 months out calls for 22.7%, 24.8% or 28.7%, depending on whether the recovery occurs before trial, during trial or after verdict.

*Heins, Mills & Olson, Counsel in the* Munco *Case* [12]

Because of the different treatment of expenses (this one applies the percentages to the class' net recovery after expenses, while most of the others apply their percentages to the gross recovery before expenses), no exact comparison is possible. But leaving that element aside, Heins proposes to receive 18% of the first $35 million recovered plus 16% of any excess. By way of comparison with the later-described Kohn bid, the crossover point between Heins and Kohn (which starts with a higher percentage and drops to lower percentages) would come at the $8.33 million recovery mark—thereafter Kohn provides greater benefits for the class. Moreover Heins places no cap on its fees, so that the later-discussed preference for Kohn becomes very strong indeed. Finally, although the amount of out-of-pocket expenses is necessarily indeterminate, any reasonable estimate cannot make this a better bid than Kohn's.

*Kaye, Scholer, Fierman, Hays & Handler,*

---

10. William Shakespeare, *King John* act 4, sc. 2, line 11.

11. Berger is part of a three-firm consortium that also includes Duker & Barrett, L.L.P. and Ritchie & Rediker, L.L.C.

12. Heins is also a member of a three-firm consortium, together with Cohen, Milstein, Hausfeld & Toll and Lieff, Cabraser, Heimann & Bernstein.

*Counsel in the* Sherman *Case* [13]

This bid alone among the eight received would give the lawyers the *higher* of two figures: a percentage of the recovery or the lodestar calculation. That would potentially introduce all of the problems and undesirable features of lodestar compensation into the situation. In addition, even the percentage approach by Kaye seeks 18% of the recovery across the board—materially worse in those terms than several of the other bids.

*Kohn, Swift & Graf, Counsel in the* K & L Feeds *Case*

■ Kohn proposes a fee of 20% of the first $5 million recovered, plus 15% of the next $10 million and 10% of the next $10 million. Because no additional fee would be charged for any recovery in excess of $25 million, this bid alone sets a cap on fees (in this instance $3.5 million). Consequently the class would obviously be far better off with any really substantial recovery than under *any* of the other bids. Why would anyone set such a limit? After all, lawyers these days seems to be operating in the universe referred to by the late Senator Everett Dirksen when he said "a billion here, a billion there, and pretty soon we're talking about real money."

But there are apparently still some practitioners who understand that $3.5 million in fees are better than the proverbial sharp stick in the eye. If knowledgeable and experienced counsel—and the Kohn firm certainly fits that description—are willing to make that bargain, this Court will not view it as mistakenly offered, and certainly not as a reason for rejection of the bid.

However, Kohn's bid is difficult to compare with the thoughtfully conceived and presented Berger bid. At some levels of recovery at certain points in time, the class would be better off economically with the Berger bid, while at others Kohn is plainly better for the class in financial terms. Any effort at comparison therefore requires making some assumptions, with no assertions of certainty, but arrived at on the basis of the best available judgment at the present:

1. It would seem unlikely, given the complexity of the matter and the ordinary course of major litigation, that these actions would be resolved within 12 months in any event. And even if it were, the effect of the Kohn cap is that the class would fare better if such a settlement were to generate about $36 million or more. At least from all of the references to numbers contained in the submissions made to this Court, that sounds like a modest prospect.

2. It would still appear unlikely in terms of the realities of major litigation (though it is certainly more probable than the 12–month time frame) that the matter will be finally resolved between 12 and 18 months after the designation of counsel. Here the effect of the Kohn cap is that the class would fare better financially if a settlement or other disposition generated something in the range of at least $25 million. And what was said in the preceding paragraph obviously applies here a fortiori.

3. Once the assumed disposition date crosses the 18–month watershed, any resolution resulting in recovery would favor the Kohn bid.

In summary, although the matter is in some respects a close call and although the credentials of the Berger-headed group are extremely impressive, the best available informed judgment as to resolution of the complex variables calls for a decision in favor of the Kohn bid.

One last point should be made about the cap on fees as an element of the Kohn bid. As Judge Walker reflected in speaking of the successful bid in the first case in which he adopted the bidding procedure, *In re Oracle Sec. Litig.,* 132 F.R.D. 538, 547 (N.D.Cal. 1990):

> The practical question is whether the Lowey bid is "too good." Does it provide an insufficient level of attorney compensation, so that the Lowey firm will be irresistibly tempted to do slipshod work or "sell-out" the class?

Translated to the current case, the concern that this Court must have is whether the cap

**13.** Kaye is associated with Bainbridge & Straus in its representation and bid.

or any other facet of the Kohn proposal could serve to chill or misdirect counsel's efforts to the detriment of the class (this same concern was voiced in the earlier-discussed Berger Memorandum).

*Oracle, id.* identified some persuasive reasons that call for rejecting any such concern where the firm involved is a regular participant in such litigation, and those reasons apply here with equal force. Moreover, in this instance the advantage that the Kohn bid enjoys over the others (except perhaps for Berger) is sufficiently great so that a possible Court-ordered deviation from Kohn's voluntarily-assumed ceiling on fees would still leave the Kohn bid the best one for the class. Accordingly, to avoid any possible detriment to the class from any potential loss of interest once a given level of prospective success is reached by class counsel (although this Court should not be misunderstood as ascribing any such lack of professionalism on the part of the Kohn firm), this Court states that if the class recovery turns out to exceed the figure that would produce $3.5 million in attorneys' fees this Court would be prepared to give consideration to a motion for the award of some bonus fee—but (1) that prospect is not part of the formal award of the designation of class counsel, which is being made in terms of the Kohn bid as actually tendered, and (2) any possible bonus, if it were in fact to be awarded, would still have to leave the class meaningfully better off financially than under any of the other original bids (including Berger's).

*Milberg Weiss Bershad Hynes & Lerach, Counsel in the* Walker Farms *Case* [14]

Milberg proposes an across-the-board fee of 25% of total recovery, to increase to 30% if the case must be tried. As another wrinkle, Milberg would agree to advance all expenses and to absorb them if there is no recovery,

with a full right of recapture out of any recovery obtained. That latter aspect needs no comment at this point, but the Milberg bid is clearly inferior to others.

*Much Shelist Freed Denenberg Ament Bell & Rubenstein, P.C., Counsel in the* General Utility *Case* [15]

Much, like Berger, frames its bid in terms of the time when a recovery is realized. If that were to happen within the first 12 months after appointment, the bid calls for fees of 20% of the first $25 million recovered, 18% of the next $25 million and 15% of everything in excess of $50 million. As expected, the numbers go up from there, but those figures need not be set out here because the initial figures (even apart from the improbability of a quick resolution) substantially exceed the Kohn figures.[16]

*Reinhardt & Anderson, Counsel in the* Consumers Supply *Case* [17]

This bid is framed in terms of a complex grid, with the x-axis expressed in terms of the several stages of litigation (before discovery begins, before summary judgment is briefed, before trial, before appeal is briefed and after appeal is briefed) and the y-axis reflecting the recovery range in millions of dollars.

There is no need to pause on this bid at all, because it is so out of range in comparison with the others that it does not bear discussion. This is the only bid under which, taking out-of-pocket expenses into account, the class could conceivably actually become the junior partner in the division of proceeds between class and counsel, receiving less than half of the total recovery. And the *lowest* percentage that is contained in the grid, based on the extraordinarily unlikely assumption that over $50 million could be

---

14. Milberg is part of a consortium that also includes Dyer, Donnelly & Lilley; Van Steenberg, Chalupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeiser; and Kost & Kost.

15. Much is part of a substantial consortium of firms that also includes Fine, Kaplan & Black; Freedman, Boyd, Daniels, Pifer, Hollander, Guttman & Goldberg; Keller Rohrback; Bailey, Harring & Peterson; Duane Morris & Hackscher; and Daughtry, Woodard, Lawrence & Starling.

16. This is even apart from the added wrinkle in the Much bid that conditions it on the size of any opt-outs (or more accurately, that increases the percentages of fees as the opt-out percentage increases).

17. Other members of the Reinhardt consortium includes Specks & Goldberg; Cochrane & Bresnahan; Chestnut & Brooks; Charles H. Johnson & Associates; and Rohan, Goldfarb & Shapiro.

recovered even before discovery begins, is 27%! In candor, this bid appears to merit the same type of pejorative characterization that this opinion has earlier attached to the memorandum emanating from the same group.

*Roda & Nast, Counsel for Prospective Plaintiffs James Parcus II and Dennis Caudle* [18]

Like the Heins bid, this one is framed in terms of percentages of net rather than gross recovery (that is, after the deduction of expenses). Its sliding scale calls for fees amounting to 20% of the first $10 million recovered, 18% of the next $15 million, 16% of the next $25 million and 14% of any excess over $50 million. It can be seen that except for the Kohn cap on fees, this bid comes reasonably close to the Kohn bid. But when all factors are taken into account, the Kohn bid remains the most favorable to the plaintiff class in economic terms.

*Summary*

As indicated by the preceding analysis, and with full consideration having been given to what appear to be the most likely probabilities, the Kohn bid holds out the best economic prospects for the putative class. And so, as already indicated at a number of points in this opinion, it is now in order for this Court to turn to the showing of that firm's quality, experience and overall credentials, as well as to one other facet of its bid.

### *Kohn, Swift & Graf*

First a point ought to be made about out-of-pocket expenses. Kohn was among the majority of bids that did not contain a provision under which the bidder agreed to a cap on expenses, although that has been done in some other cases. Instead Kohn has included several commitments that would tend to minimize the out-of-pocket expenses, and it has also agreed to submit periodic reports to this Court for review.

That factor is not troublesome to this Court in considering an award of representation. There is indeed a serious question as to the ethical propriety of an agreement by counsel to bear the client's actual out-of-pocket expenses without a right of reimbursement (a subject dealt with by Professor Stephen Gillers in a June 26, 1990 professional ethics opinion submitted to the Milberg firm in connection with the *Acc/Lincoln Sav.* matter and tendered to this Court as an exhibit to the Simon Memorandum). Moreover, any attempt to set a cap as to *that* component of the litigation at its outset (when there are so many unknown variables) would tend to introduce an added wild card that would make the presentation of an optimum *fees* bid more difficult (fees are after all something as to which lawyers have more experience in estimating, and hence more ability to make an informed advance judgment). Accordingly this Court does find the nature of the Kohn proposal as to expenses entirely acceptable.

Now to the Kohn firm itself. Although a small firm by today's megafirm standards,[19] it has amply demonstrated its ability to handle major litigation. Instead of paraphrasing the credentials that this Court has scrutinized with care, this opinion will simply quote the accurate summary contained at Freed Memorandum 22–24:

---

**18.** Roda is part of a four firm consortium, the other members of which are Hare, Wynn, Newell & Newton; Becnel, Landry & Becnel; and Zimmerman Reed, P.L.L.P.

**19.** Although this Court trusts that it has no anti-megafirm bias, it is well aware that the quality of legal representation is a function of which lawyer or lawyers are handling a matter—not of the size of the legal organization. As a private practitioner this Court spent its entire career with a single law firm, which began as a three-lawyer firm (this Court was the fourth lawyer), which grew slowly by choice over the years and which deliberately stayed at a size in the range of 20 lawyers, all the while resisting frequent offers of merger or acquisition as well as the temptation to expand to larger size. It still gained recognition as a high-quality firm, capable of handling (and actually handling) large and complex matters (both in litigation and in transactions) and receiving recognition by legal publications as one of the outstanding firms in the country. It appears to be increasingly difficult these days for small law firms to preserve a high level of quality (except perhaps for the so-called boutique firms), but it is far from impossible. Indeed, perhaps the biggest problem faced by high-quality small firms in recent years has been the increasing misperception by clients and potential clients (unaware of the truism stated at the outset of this footnote) that bigger is necessarily better.

Kohn, Swift & Graf, P.C., a Philadelphia, Pennsylvania firm of 21 lawyers, has been a pioneer in the class action field and has been among the lead counsel in scores of antitrust and other class actions throughout the country in the last 25 years. In that time, it has represented both plaintiffs and defendants in major antitrust, securities, consumer and other complex legal matters. The firm has taken a leadership role in such cases as *Cumberland Farms, et al. v. Browning Ferris Industries, et al.,* Master File No. 81–3717 (E.D.Pa.); *In re Chlorine and Caustic Soda Antitrust Litigation,* Master File No. 86–5428 (E.D.Pa.); *In re Glassine and Greaseproof Paper Antitrust Litigation,* MDL No. 475 (E.D.Pa.); *In re Water Heater Antitrust Litigation,* MDL No. 379 (E.D.Pa.); and many others.

The attorneys with principal responsibility for this matter are Harold E. Kohn, Robert A. Swift, Joseph C. Kohn and William E. Hoese. Harold Kohn, the firm's senior shareholder, has more than 50 years legal experience. In his career he had maintained an active business litigation practice and has tried and argued cases throughout the country. He worked with the drafters of the original Manual for Complex Litigation and its revisions. He served as a member of the Committee of Lead Counsel for plaintiffs in the *Electric Equipment Antitrust Litigation* in the 1960s and personally tried the *Plywood Antitrust Litigation,* MDL No. 159, before the Honorable Judge Sam Pointer, assisted by another member of the firm, Wayne Thomas. In that case, Mr. Kohn obtained a jury verdict in favor of the class estimated at $1 billion, later settled for $165 million.

Robert A. Swift has been a member of the bar since 1973. He has tried numerous jury and non-jury cases in state and federal courts, and has argued in a number of appellate courts, including in the Supreme Court of the United States. As lead counsel, he personally tried in *Marcos Human Rights Litigation* (D.Ha.) before the Honorable Judge Manuel Real, in which a class of 10,000 victims of torture obtained a verdict in excess of $2 billion.

Joseph C. Kohn, admitted to practice in 1982, has extensive experience in antitrust and other class action litigation, including the *Chlorine* and *Waste Haulers* cases before Chief Judge Bechtle of the Eastern District of Pennsylvania, each of which settled on the eve of trial for more than $50 million. He has also been involved in the recently concluded *Tampico Fiber* and *Plastic Tableware* antitrust cases in the Eastern District of Pennsylvania. Like Mr. Harold Kohn and Mr. Swift, Mr. Joseph Kohn is among the relatively few lawyers in the country to have tried a class action case to a jury. He was lead counsel in the *Montgomery Ward Catalog Sales Agency Litigation,* MDL No. 685 (E.D.Pa.), which was settled after a five week trial for $25 million.

William Hoese, a member of the bar since 1984, joined Kohn, Swift from the Philadelphia regional office of the United States Securities and Exchange Commission. Since joining the firm in 1989, he has been involved in complex antitrust, securities, consumer and mass tort litigation, including *In re Domestic Air Transportation Antitrust Litigation,* MDL 826 (N.D.Ga.); *Alvord–Polk, Inc., et al. v. F. Shumacher & Co.,* and *Wadleight v. Rhone–Poulenc Rorer, Inc., et al.,* MDL 986 (N.D.Ill.).

*Conclusion*

This Court designates Kohn, Swift & Graf, P.C. as counsel for the putative class in this MDL proceeding in accordance with the terms of that firm's previously-sealed bid. As a member of the previously-designated lead counsel group, the firm has already participated in the initial drafting of a consolidated class action complaint, and it is ordered to complete that task expeditiously. Because it is anticipated that the consolidated complaint will follow the existing complaints closely, and because defendants have already had a substantial period of time within which to familiarize themselves with the

existing complaints, defendants are ordered to file their answers to the consolidated complaint within 14 days after it is delivered to defense counsel.

Kohn is of course authorized, if it wishes, to affiliate itself with a Chicago firm (the Much firm or any other [20]) for convenience of service of motions, attendance at status conferences and other purposes. It may also establish other affiliations for the performance of work on the consolidated case, but it is understood that the total compensation for all participating lawyers will be governed by the Kohn bid.

As for the other firms that have been involved up to this point, they are directed to look to their own clients (the named plaintiffs in the individual actions or in the one unfiled prospective action) for all compensation, past and future.[21] And to cut down on the already unwieldy service list in this MDL litigation, each of the groups other than the Kohn firm is directed within two weeks to designate only a single firm within the group to receive notices and copies of filings for the plaintiff in each of the constituent actions (that firm then being responsible as an internal matter for transmittals to the clients and to the other firms).

As for Order No. 1, this opinion's n. 1 has already covered several of the required modifications to its provisions. In addition, Order No. 1 ¶ 10 is of course amended by designating the Kohn firm as lead counsel, instead of three firms (that firm and two others) that were originally designated as co-lead counsel.

---

**20.** This Court is aware that under Order No. 1 those two firms had already established a relationship as co-lead counsel, although the Much firm (which had also served as courtesy liaison for a number of other out-of-city firms) was compelled by the nature of the bidding process to choose a single affiliation for purposes of bidding, and it linked up with a bidding group other than the Kohn firm. This footnote is not intended to limit Kohn's options, but rather simply to indicate that this Court would perceive no ethical difficulties if Kohn were to choose to re-establish the relationship with the Much firm (though it should again be emphasized that the choice is its own).

**21.** Prior services as co-lead counsel under Order No. 1 would seem to be an appropriate exception to that handling. Those services by the two lead counsel firms other than Kohn should not of course operate to reduce the Kohn fee. Accordingly those two other firms previously included as co-lead counsel should retain their time records for purposes of a possible future fees application, probably to be treated in the same fashion as out-of-pocket expenses.