**In re QUINTUS SECURITIES LITIGATION.**

**In re Copper Mountain Networks Securities Litigation.**

**Nos. C–00–4264 VRW, C–00–3894 VRW.**

United States District Court,
N.D. California.

April 12, 2001.

Francis M. Gregorek, Francis A. Bottini, Jr., Betsy C. Manifold, Wolf, Haldenstein, Adler, Freeman & Herz, LLP, San Diego, CA, Lawrence G. Soicher, Law Offices of Lawrence G. Soicher, New York City, for Plaintiff.

Eduard Korsinsky, Beattie and Osborn, LLP, New York City, for Plaintiff.

Philip C. Tencer, William E. Grauer, Cooley and Godward, LLP, San Diego, CA, for Defendant.

## ORDER

WALKER, District Judge.

On March 8, 2001, the court held a hearing to consider the selection of lead plaintiff and lead counsel in two securities class action lawsuits presently before the court, *In re Copper Mountain Sec. Lit* and *In re Quintus Corp. Sec. Lit.* Because the two cases involve similar issues, the court will address both cases in this order.

Both cases involve fairly typical "stock drop" scenarios in which the complaints allege that defendants made misstatements and omitted to disclose adverse information that defendants were under a duty to disclose causing purchasers to pay more for the companies' stock than it was worth. In *Copper Mountain*, the alleged class consists of purchasers who bought the stock on the open market between April 18, 2000, and October 17, 2000. The *Quintus* complaints allege a class of purchasers of Quintus stock on the open market during the period from November 15, 1999, to November 15, 2000, and a class consisting of purchasers of Mustang.com stock whose shares were converted into Quintus shares when the two entities merged.

Before the hearing the court requested that the parties seeking to serve as lead plaintiff respond to 10 questions regarding their stock transactions and their selection of counsel. See Appendix A.

## I

### A

In the *Copper Mountain* case, two individuals and one group comprising five individuals seek to be appointed lead plaintiff. Each of these seven individuals submitted declarations in response to the court's 10 questions. Furthermore, each individual attended the March 8 hearing and spoke directly to the court about his qualifications and interest in representing the class. Pertinent portions of these representations follow.

The first proposed lead plaintiff, William A Chenoweth, is a fifty year old certified public accountant residing in Birmingham, Alabama. He has an undergraduate degree in computer science from Vanderbilt University as well as an MBA from Brigham Young University. Chenoweth asserts that he has read several news reports and objective analyses regarding the transactions at issue in this matter, and is thus prepared to direct lead counsel regarding investigation and other litigation preparation. Chenoweth, however, has not negotiated a fee arrangement with any proposed class counsel, stating that he will undertake such negotiations after he is appointed lead plaintiff. Chenoweth said that he believes that he would have more leverage in these negotiations after being designated lead plaintiff than before. Chenoweth estimates his damages to be approximately $295,000. See Hagan Decl. (Doc. # 28), ¶ 4.

The second proposed lead plaintiff, Quinn Barton, was originally one of 10 individuals comprising a group seeking lead plaintiff appointment as the Prendergast group. Only Barton, however, still seeks appointment. Barton is currently a self-employed investor residing in Jacksonville, Florida. He received an MBA from George Washington University and worked on Wall Street for approximately 10 years, much of that time as a commercial bond trader. Once Barton decided to become involved in this litigation, he contacted Beattie and Osborne LLP, a New York law firm, and negotiated a descending percentage fee agreement with percentages ranging from 15% down to 10% and related fee limits as follows:

| Recovery | Fee Percentage | Up to |
|---|---|---|
| $0–$20,000,000 | 15% | $2,000,000 |
| $20,000,001–$40,000,000 | 12% | $4,000,000 |
| $40,000,00 + | 10% | $8,000,000 |

Under the agreement, the attorney fee is calculated depending on the tier within which the total recovery falls. The requisite percentage is applied to the entire recovery, not just the portion of the recovery falling within the range corresponding to that percentage. For example, a $15,000,000 recovery would generate a fee based on 15% of the recovery, $2,250,000, which would then be reduced by

the cap to $2,000,000. A $35,000,000 recovery, on the other hand, would trigger a calculation under the second tier and generate a fee of $4,200,000 (12% of $35,000,000), which would be reduced by the second tier's cap down to $4,000,000. The agreement awards expenses incurred by counsel from the recovery fund before the fee is computed. Barton purchased only 1,000 shares during the class period; he did not calculate his damages but counsel for some of the other plaintiffs calculated Barton's damages to be approximately $59,000. See Weaver Decl. (Doc. # 53), Exh B at 1.

The "Copper Mountain Investors" (CMI), a group of five individuals currently represented by Milberg Weiss Bershad Hynes & Lerach, is the final proposed lead plaintiff. The group is comprised of David Cavanaugh, Michael P. Hannon, Robert A. Herrgott, Raymond Pfeifer and Richard Weiss. These individuals ask the court to appoint them as a group primarily based on their assertion that, as a group, they bring a wider range of personalities, skills and decision-making abilities to the lead plaintiff role than any individual could bring.

The member of CMI with the greatest loss is Cavanaugh. He is a retired vice president of sales for a large international company. Cavanaugh has an undergraduate degree in business administration. Although he did not seek out other law firms before deciding to retain Milberg Weiss, he represents that he conducted some preliminary research that persuaded him to contact the firm. Cavanaugh's damages are estimated to be approximately $943,000. Weaver Decl. (Doc. # 53), Exh A at 1.

Hannon is a certified public accountant and a business broker residing in Minneapolis. He has been appointed by federal bankruptcy judges to assist in the disbursement of bankruptcy assets. Because of this experience, Hannon is familiar with legal proceedings. Hannon states that he contacted and interviewed lawyers from at least eight law firms in the process of determining which counsel to hire. After much research, he decided to hire Milberg Weiss based on the recommendations of others and his own assessment of the firm's abilities. Before

agreeing to retain Milberg Weiss, he discussed potential fee arrangements with the firm. Hannon's damages are estimated to be approximately $765,000. Id. at 4.

Weiss is a commercial real estate developer residing in Phoenix, Arizona. He has an undergraduate degree in business and has served as an expert witness in complex real estate trials. Weiss asserts that his daily job requires extensive and continuous negotiations with architects, engineers, contractors and other individuals involved in the business. Weiss initially contacted another law firm before being referred to Milberg Weiss. Weiss calculates his losses to be about $633,000. Id.

Pfeifer is a senior vice president of corporate marketing at a high tech company in Silicon Valley, where he currently resides. As with others in the CMI group, Pfeifer also has an undergraduate degree in business administration. Pfeifer's damages are estimated to be about $524,000. Id.

Finally, Herrgott is both the president of a construction company and a broker. He lives in Michigan and received an MBA from Wayne State University. Herrgott is also a chartered financial analyst, which he states provides him with a working knowledge of accounting-related principles. Herrgott claims that he has extensive experience trading stocks. The losses incurred by Herrgott have been calculated to be approximately $462,000. Id.

These five individuals negotiated with Milberg Weiss as a group for the following ascending percentage fee arrangement:

| Recovery | Fee Percentage |
| --- | --- |
| $0–$10,000,000 | 20% |
| $10,000,001–$25,000,000 | 25% |
| $25,000,001 + | 30% |

Under the agreement, the increasing percentages apply only to the amount of recovery over the recovery limit for the lower percentage. For example, the fee award on the first 10 million of recovery is always 20%. All expenses are paid out of counsel's share of the recovery.

## B

In *Quintus*, two groups of plaintiffs offer themselves as lead plaintiffs. Apodaca Investment Group, Pat Mulcair, Gene Salkind and Colin Hill comprise one group (Quintus Investors)˙ and are represented by Milberg Weiss Bershad Hynes & Lerach. Robert Cross and Roger Micnaud (Cross & Micnaud) are the other group and are represented by Weiss & Yourman. Another group, the Harrer group, withdrew its bid to serve as lead plaintiff before the hearing. None of the prospective lead plaintiffs appeared in court for the March 8 hearing. Five of the six prospective lead plaintiffs submitted declarations in response to the court's 10 questions. Roger Micnaud failed to respond.

Cross purchased Quintus shares on the open market and claims a loss of approximately $678,000. See Gordon Decl. (Doc. # 10), Exh A at 1. Cross proposes to employ Weiss & Yourman to represent the class for a fee of 25% of any recovery plus expenses. Cross Decl. at 2. Micnaud acquired Quintus shares through the Mustang.com merger and approximates his losses at $35,000. See Gordon Decl. (Doc. # 10), Exh A at 2. Micnaud moved to be named lead plaintiff of a subclass of plaintiffs who acquired Quintus stock through the Mustang.com merger. Micnaud has not submitted a declaration. Neither Cross nor Micnaud was present at the March 8 hearing.

The Quintus Investors group claims losses of $4,223,000. The group proposes to hire Milberg Weiss to represent the class with the following fee arrangement:

| Recovery | Fee Percentage |
| --- | --- |
| $0–$4,000,000 | 5.0% |
| $4,000,001–$8,000,000 | 12.5% |
| $8,000,001–$15,000,000 | 17.5% |
| $15,000,001–$20,000,000 | 22.5% |
| $20,000,001 + | 30.0% |

As initially proposed, the Quintus Investors proposed to have expenses paid out of the class' recovery. At the hearing, however, Milberg's representative told the court that the firm was willing to take expenses out of its fees.

Mulcair and Hill acquired Quintus shares through both the open market and the Mustang.com merger. Salkind acquired shares only through the Mustang.com merger and Apodaca acquired shares only on the open market. The four Quintus Investors each allege losses greater than Cross and Micnaud's losses. Apodaca, Hill and Salkind are willing to serve as lead plaintiff as an individual; Mulcair is not.

## II

Under the Private Securities Litigation Reform Act (PSLRA), 15 USC § 78u–4, et seq., the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the 'most adequate plaintiff') in accordance with this subparagraph." 15 USC § 78u–4(a)(3)(B)(i). The PSLRA creates a rebuttable presumption that the most adequate plaintiff is "the person or group of persons that * * * has the largest financial interest in the relief sought by the class * * * and otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 USC § 78u–4(a)(3)(B)(iii)(I)(bb).

The presumption is rebuttable if a member of the plaintiff class shows that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 USC § 78u–4(a)(3)(B)(iii)(II)(aa), (bb). These provisions of the PSLRA reinforce the fundamental or overriding requirement of FRCP 23(a)(4) that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all *only* if * * * the representative parties will fairly and adequately protect the interests of the class." FRCP 23(a)(4) (emphasis supplied). The two principal responsibilities assumed by a lead plaintiff are: (1) monitor the conduct of class counsel, and (2) decide whether and when the case should be settled or taken to trial. Only a lead plaintiff

who can reasonably be expected to discharge these responsibilities can be considered adequate under FRCP 23.

■■■ Almost certainly, the best way for the court to assess a potential lead plaintiff's adequacy is to consider the manner in which he has retained counsel and negotiated an attorney's fee for the class. Under the PSLRA, selection of lead counsel falls initially on the shoulders of the lead plaintiff, "subject to approval of the court." 15 USC § 78u–4(a)(3)(B)(v). Selection of lead counsel is one of the most important decisions a lead plaintiff makes. In making the counsel selection, the lead plaintiff must seek to vindicate the interests of the class, to whom he owes a fiduciary duty. See *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Absent class members are owed competent counsel at a reasonable fee. Thus, a proposed lead plaintiff can best demonstrate the willingness and ability to discharge the fiduciary duties of the lead plaintiff by demonstrating the willingness and ability to take charge of the litigation and negotiate a reasonable representation arrangement with class counsel. Accordingly, if a representative plaintiff does not select competent counsel, he cannot meet the adequacy requirement of FRCP 23 and the PSLRA. See *Baffa v. Donaldson, Lufkin & Jenrette Securities*, 185 F.R.D. 172, 177 (S.D.N.Y.1999) ("The court also finds Dorflinger's choice of counsel renders her inadequate to serve as class representative."), rev'd on other grounds, 222 F.3d 52 (2d Cir.2000) (vacating finding of counsel's inadequacy without addressing whether selection of inadequate counsel renders plaintiff an inadequate representative). Similarly, a purported lead plaintiff that does not negotiate a reasonable fee arrangement with counsel cannot be deemed an adequate representative.

Unfortunately, many plaintiffs in a class action lack the incentive and/or ability to negotiate with prospective counsel to obtain a competitive fee arrangement. Selecting between different law firms and proposals can be an expensive, time consuming and even difficult process. Often, however, an individual's stake in a class action suit is too small to justify such an effort. See, e.g., *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

■■■ If the court determines that the plaintiff with the largest loss has adequately negotiated with counsel, then the adequacy requirement·of FRCP 23(a)(4) is met and the presumption is not rebutted. In the event of such a showing, the court need not, and indeed should not, substitute its judgment for that of the lead plaintiff. See Declaration of Joseph Grundfest in *Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146 (N.D.Cal. 1999) (hereinafter, Grundfest Decl.), ¶ 10.

■■■ On the other hand, if the court determines after reviewing submissions and holding a hearing that no prospective lead plaintiff has adequately selected counsel, the court is faced with a couple of options. If it appears that a plaintiff has the ability and incentive to conduct adequate negotiations, the court may request that this plaintiff undertake such a process and appoint the plaintiff as lead plaintiff subject to confirmation that the responsibility of identifying and negotiating reasonable arrangements with counsel has been discharged. A judge in this district, Judge Alsup, followed this course in *In re Network Associates, Inc., Sec. Lit.*, 76 F.Supp.2d 1017 (N.D.Cal.1999).

■■■ If, on the other hand, it appears that the purported lead plaintiff lacks the ability and incentive to negotiate an adequate arrangement with class counsel or has negotiated an arrangement but one that inadequately protects the interests of the class, the court is faced with a tougher choice. The court could find that the action will be unable to proceed as a class action due to want of an adequate class representative. That, of course, has the undesirable effect of foreclosing any possibility of relief to the class until another (adequate) class representative steps forward. Alternatively, the court may itself establish terms for the class' representation or initiate a process by which those terms can be established.

In so doing, the court is implementing the mandate of both the PSLRA and FRCP 23. The PSLRA requires that: "Total attorneys' fees and expenses awarded by the court to

counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 USC § 78u–4(a)(6). In addition, the court's fiduciary duty toward the plaintiff class requires intervention to guarantee a reasonable fee. The Supreme Court has stated repeatedly, albeit in different contexts, that reasonableness is measured by market indicia. See, e.g., *Missouri v. Jenkins*, 491 U.S. 274, 286, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *Blum v. Stenson*, 465 U.S. 886, 895–96, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

The so-called lodestar and benchmark percentage fee arrangements are examples of attempting to take that measure. A more recent, and increasingly widely used, approach is competitive bidding. The former offer the appeal of setting the fee when the outcome of the case is known. But many courts have decided that this sacrifices accurate assessment of the market for legal services and the possibility of achieving the benefit of competition for the class. See *Raftery v. Mercury Finance Co.*, 1997 WL 529553 at * 2 (N.D.Ill.1997) ("MSBI also submits that the Reform Act's regulation of attorney fees ensures that the court will retain complete discretion over the amount of fees awarded, obviating the need for competitive bidding. This statement presupposes, of course, that the court will be able to divine the reasonable value of the services rendered when the time comes, a false presupposition.").

### III

As Congress recognized in enacting the PSLRA, "[c]ourts traditionally appoint[ed] lead plaintiff and lead counsel in class action lawsuits on a first come first serve basis." S.Rep. No. 104–98 (1995), reprinted in U.S.C.C.A.N. 679. "This encouraged a 'race to the courthouse' among parties seeking lead-plaintiff status and spawned a cottage-industry of specialized securities litigation firms that 'researched potential targets for these suits, enlisted plaintiffs, controlled the litigation, and often negotiated settlements that resulted in huge profits for the law firms with only marginal recovery for the share-

holders.'" *In re Cendant Corp. Lit.*, 182 F.R.D. 144, 145 (D.N.J.1998) (quoting *Gluck v. CellStar Corp.*, 976 F.Supp. 542, 544 (N.D.Tex.1997)).

Under this regime, courts made fee awards to class counsel to recognize counsel's role in creating the class' fund of recovery. See *Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161, 165 (3d Cir.1973). Almost universally, courts determined counsel's fees at the close of litigation. The standard for such awards was a reasonable multiple of attorney hours and rates or lodestar. See *id.* at 167–70. This regime spawned wide dissatisfaction. A pioneering study by a task force of the Third Circuit Court of Appeals attacked retrospective fee determinations and called for the lodestar method to be replaced by a reasonable percentage fee. *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 FRD 237 (1985). Early on, the percentage approach was endorsed by a judge of this court. See, e.g., *In re Activision Sec. Lit.*, 723 F.Supp. 1373 (N.D.Cal. 1989).

Then in *Oracle*, the undersigned employed a percentage fee to resolve a conflict that had broken out among lawyers competing to represent a class of securities purchasers. See *In re Oracle Sec. Lit.*, 131 F.R.D. 688 (N.D.Cal.1990). The court, in *Oracle*, asked prospective lead counsel to submit bids to the court and compete for the position of lead counsel. Competition worked well in that case: the class obtained a recovery of $25,000,000 and class counsel's fee was $4,800,000, 19.5% of the settlement fund, markedly lower than the typical or benchmark percentage of recovery consumed by fees and expenses. *In re Oracle Sec. Lit.*, 852 F.Supp. 1437, 1457 (N.D.Cal.1994); see also Grundfest Decl., ¶ 23.

Since the *Oracle* case, this court has employed competitive bidding in two other cases. The first was a securities class action case not governed by the PSLRA. See *In re Wells Fargo Sec. Lit.*, 156 F.R.D. 223 (N.D.Cal.1994); *In re Wells Fargo Sec. Lit.*, 157 F.R.D. 467 (N.D.Cal.1994). The second case was a securities class action case governed by the PSLRA. See *Wenderhold v.*

*Cylink,* 188 F.R.D. 577 (N.D.Cal.1999); *Wenderhold v. Cylink,* 189 F.R.D. 570 (N.D.Cal. 1999); *Wenderhold v. Cylink,* 191 F.R.D. 600 (N.D.Cal.2000). In *Wenderhold,* the court rejected the aggregation principle and appointed an individual lead plaintiff. *Wenderhold,* 188 F.R.D. at 584–87. Finding that lead plaintiff incapable of negotiating a competitive fee arrangement, the court opted to employ competitive bidding. *Id.* at 587. Upon receiving bids from the competing firms, the court selected counsel it deemed most qualified, considering both monetary and nonmonetary factors. *Id.* at 587–88. This was essentially the procedure used in *Oracle* and *Wells Fargo.*

In another securities class action, the court was poised to institute competitive bidding but instead was able to appoint as lead plaintiffs two institutional investors capable of selecting and monitoring counsel. See *In re California Micro Devices Sec. Lit.,* 168 F.R.D. 257, 275–76 (N.D.Cal.1996); *In re Cal. Micro Devices Sec. Lit.,* 168 F.R.D. 276, 278 (N.D.Cal.1996).

A number of other judges have employed competitive bidding to select lead counsel in class action cases. Judge Milton Shadur of the Northern District of Illinois, for example, used competitive bidding in *In re Amino Acid Lysine Antitrust Lit.,* 910 F.Supp. 696 (1995). That case involved allegations of "a conspiracy to fix the price of lysine, an amino acid derived from corn that is used primarily as a livestock dietary supplement to speed muscle growth in poultry and hogs," in violation of the antitrust laws. *Id.* at 698. In response to motions to appoint lead counsel, Judge Shadur had requested prospective lead counsel to submit sealed bids to the court and to argue for or against the use of competitive bidding. *In re Amino Acid Lysine Antitrust Lit.,* 918 F.Supp. 1190, 1192 (N.D.Ill.1996).

Judge Shadur decided to employ competitive bidding to protect the interests of absent class members. He wrote: "the fact that the putative class representative who brings an action has chosen a particular lawyer (or vice versa, as everyone knows is frequently the case in the real world) gives no assurance-or even presumptive assurance-that the selected lawyer is the best choice for the absent class members." *Id.* at 1194. The fact that the representative plaintiffs involved in the case had large financial interests and thus had an incentive to drive a hard bargain with counsel did not dissuade Judge Shadur from using competitive bidding. *Id.* at 1194.

Judge Shadur also employed competitive bidding in a securities fraud class action governed by the PSLRA. See *In re Bank One Shareholders Class Actions,* 96 F.Supp.2d 780 (N.D.Ill.2000). Judge Shadur's approach was for the most part similar to the approach he used in *In re Amino Acid* and that was employed in *Oracle, Wells Fargo* and *Wenderhold.* Judge Shadur called for sealed bids and then reviewed the bids to determine which proposed counsel would provide the best representation for the class based on monetary and nonmonetary factors. *Id.* at 785–89.

Judge Shadur, however, gave a somewhat different legal rationale for imposing competitive bidding than had the undersigned. Judge Shadur refrained from appointing a lead plaintiff until after he had considered the bids from prospective lead counsel and determined which bid was the most advantageous to the class. Judge Shadur then gave the presumptive lead plaintiff (based on financial interest) the opportunity to select the counsel the court had determined to be the best. Judge Shadur stated:

> It should be remembered that although Subsection (a)(3)(B)(v) [of the PSLRA] provides that the most adequate plaintiffs may "select and retain counsel to represent the class," that opportunity is expressly made "subject to the approval of the court." In this Court's view, if the presumptive lead plaintiffs were to insist on their class counsel handling the action on the hypothesized materially less favorable contractual basis, that insistence would effectively rebut the presumption that the putative class representatives, despite the amounts that they have at stake personally, were indeed the "most adequate plaintiffs"—that is, the class members "most capable of adequately representing the interests of class members" (Subsection (a)(3)(B)(i)). If on the other

hand the presumptive class representative were willing to be represented by the most favorable qualified bidder among the lawyers submitting bids, with that bidder either supplanting the presumptive lead plaintiff's original choice of counsel or working together with that original counsel (but with the total lawyers' fees to be circumscribed by the low bidder's proposal), the presumption would clearly remain unrebutted and the presumptive most adequate plaintiffs would properly be appointed as lead plaintiffs.

*Id.* at 784.

Under this approach, the lead plaintiff technically selects counsel himself, as called for by the PSLRA. But, the lead plaintiff's discretion is completely curtailed. If he does not select the counsel the court has deemed most advantageous, then he will be found inadequate and rejected as lead plaintiff.

Another judge in the Northern District of Illinois, then Magistrate Judge Lefkow, has also employed competitive bidding to select counsel in a securities class action case governed by the PSLRA. In *Raftery v. Mercury Finance Co.,* 1997 WL 529553 (N.D.Ill. 1997), the court called for plaintiffs seeking designation as lead plaintiff to submit bids by the law firms they had retained. The court stated that it would consider the proposals and if "the court concludes that the proposal of the presumptively most adequate plaintiff is significantly less favorable than other proposals, thus rebutting the statutory presumption, it will issue a decision disclosing the various proposals and will designate as lead plaintiffs that plaintiff or group of plaintiffs that will most adequately protect the interests of the class in light of all the statutory factors." *Id.* at *3.

Thus, Judge Lefkow appeared willing to defer to the presumptive lead plaintiffs choice of counsel and fee arrangement as long as it was reasonable. This differed from Judge Shadur's insistence that the best deal be obtained for the class.

Another approach to competitive bidding was taken by Judge Walls in *In re Cendant Corp. Lit.,* 182 F.R.D. 144 (D.N.J.1998). *Cendant* was a securities class action governed by the PSLRA. Thus, the court's appointment of lead plaintiff was initially dictated by the presumption that the plaintiff with the greatest financial interest in the litigation should serve as lead plaintiff. 15 USC § 78u–4(a)(3)(B)(iii). The court selected a group of institutional investors to serve as lead plaintiff. *Cendant,* 182 F.R.D. at 147. The court then selected lead counsel via a competitive bidding process in which monetary and nonmonetary factors were considered.

Judge Walls concluded that an auction was permissible because under the PSLRA the lead plaintiff's choice of counsel is subject to the court's approval based on the court's "discretionary judgment that lead plaintiff's choice of representative best suits the needs of the class." *Id.* at 150. The court's duty to ensure a reasonable fee also justified the use of competitive bidding.

Judge Walls departed from earlier approaches to competitive bidding by giving the counsel initially selected by the lead plaintiff a right to match the low bid and serve as lead counsel if it was otherwise qualified. *Id.* at 151. This approach preserved the lead plaintiff's choice of counsel but, in Judge Walls' view, improved the fee arrangement.

Competitive bidding was also employed in a post-PSLRA securities class action case by Judge Lenard of the Southern District of Florida. See *Sherleigh Associates LLC v. Windmere–Durable Holdings, Inc.,* 184 F.R.D. 688 (S.D.Fla.1999). The court in *Sherleigh* recognized that the PSLRA assigns the task of selecting counsel to the lead plaintiff but also requires the court to ensure that the attorney fees awarded are reasonable. *Id.* at 693. The court stated: "A court presented with competing claims for designation and concerned with ensuring quality representation at a fair price is faced with a conundrum: What deference should be paid to the class representative's choice of counsel, as balanced against the court's obligation to the class to ensure such representation is of high quality and is provided at a fair price?" *Id.* at 693.

The balance the court struck was the use of competitive bidding. Of course, use of competitive bidding in all cases does not real-

ly strike a balance at all. It gives no deference whatsoever to the lead plaintiff's choice of counsel. Judge Lenard, emphasized, however, that the proposed representation in the case before her was particularly inadequate. It involved a "consortium of ten law firms" that Judge Lenard deemed not in the best interests of the class. *Id.* at 692. Presumably, had a different arrangement been suggested by the lead plaintiff, Judge Lenard might not have employed competitive bidding. With respect to the bidding process, like Judge Shadur and the undersigned, Judge Lenard emphasized that both monetary and non-monetary factors would be considered in selecting lead counsel based on the proposals submitted. *Id.* at 696.

Judge Alsup, who as noted sits in this district, employed a variation of the competitive selection process in *In re Network Associates*, 76 F.Supp.2d 1017. Judge Alsup provisionally selected an institutional investor to serve as lead plaintiff. Final selection, however, was made contingent on the plaintiff engaging in a competitive counsel selection process. *Id.* at 1034. The proposed lead plaintiff, rather than the court, was to solicit bids from firms and choose the bid it considered most advantageous. *Id.*

This approach is faithful to the text of the PSLRA, which delegates the duty of selecting lead counsel to the lead plaintiff, but at the same time secures for the class the benefits of a competitive selection process. The use of this procedure, however, was only possible because a sophisticated, interested plaintiff came forward to serve as lead plaintiff. Judge Alsup did not have to face the situation in which no such party comes forward.

Competitive bidding was also used by Judge Lechner in another post-PSLRA case, *In re Lucent Technologies, Inc.*, 194 F.R.D. 137 (D.N.J.2000). Judge Lechner provisionally appointed a lead plaintiff and then decided to hold an auction to select lead counsel. *Id.* at 155. There was no evidence before the court that the lead plaintiff had selected and negotiated with counsel at arms length. Thus, the court found that a competitive auction was "necessary to protect the interests of the proposed class." *Id.* at 156.

Judge Lechner pointed to the discretion afforded to the court in approving counsel as justification for its intervention. *Id.* at 155. Had there been evidence that the lead plaintiff competitively selected and negotiated with counsel, it seems possible that Judge Lechner would not have imposed an auction.

Finally, competitive bidding to select lead counsel was employed by Judge Kaplan in *In re Auction Houses Antitrust Lit.*, 197 F.R.D. 71 (S.D.N.Y.2000), an antitrust case brought against Sotheby's and Christie's auction houses. Judge Kaplan found the case well-suited for selection of lead counsel by an auction after consulting with the parties and considering amicus curiae briefs. *Id.* at 73–74. Judge Kaplan's approach to bidding differed from that used by the other judges mentioned. Judge Kaplan requested the parties to bid on an amount of recovery, "X", that would go completely to the plaintiff class. *Id.* at 73. Counsel would receive 25% of any recovery over "X" and the remaining 75% of that amount would go to the class. *Id.* Judge Kaplan used this approach because, with access to Department of Justice documents, he concluded that the risk of no recovery was minimal. *Id.* at 82.

 The approach followed by this court tracks the approaches employed by the other judges discussed above in many respects. Unlike Judge Shadur's approach, however, the court would give slightly more deference to the lead plaintiff's choice of counsel. A plaintiff can be adequate even if he negotiates a fee arrangement that the court would not have selected on its own, as long as the arrangement is reasonable. And unlike Judge Walls, the court would be hesitant to employ competitive bidding if an institutional investor had come forward and negotiated a fee arrangement that appeared reasonable. In this respect, the court's approach is similar to Judge Lenard's and Judge Lefkow's. Both of those judges indicated a willingness to defer to plaintiff's choice, if reasonable fee negotiation had occurred.

## IV

The court's assessment of the prospective lead plaintiffs in the *Copper Mountain* case

is that at least some of them have undertaken much greater efforts than the prospective *Quintus* plaintiffs. Indeed, all three sets of *Copper Mountain* plaintiffs vying to be appointed lead plaintiff appeared at the March 8 hearing and expressed a desire to take on the responsibility of lead plaintiff. Only Barton and the five individuals comprising CMI, however, demonstrated a willingness to undertake negotiations with counsel.

 Chenoweth, on the other hand, failed to negotiate at all on behalf of the class for a fee arrangement with counsel. Chenoweth asserts that he has neglected this obligation under the belief that he could negotiate a better fee arrangement if he is appointed lead plaintiff. This argument is not impressive. It asks the court to invest its faith (and the fate of the class) on Chenoweth's apparent, as opposed to demonstrated, ability to negotiate a fair fee arrangement. In this, as in all else, actions are better than promises. Furthermore, the negotiations by all those seeking to serve as lead counsel are predicated on the assumption that they will be designated as lead plaintiff; that predicate underlies all fee arrangements proposed to the court. Indeed, the experiences of Barton and CMI evidence the availability of such pre-appointment negotiation opportunities.

The PSLRA charges the court with appointing the most adequate plaintiff, but without a demonstration that Chenoweth is willing and able to negotiate with class counsel, the court cannot determine him to be the most adequate plaintiff. As a result, Chenoweth's motion to be appointed lead plaintiff (Docs. # 26 and 27) is DENIED.

 This leaves Barton and CMI to be considered as potential lead plaintiffs in *Copper Mountain.* As noted, both Barton and CMI have demonstrated a willingness to negotiate with counsel. Due to the size of their claimed losses each member of the CMI group enjoys the benefit of the PSLRA most adequate plaintiff presumption. Each of the five CMI individuals has incurred individual losses that exceed the damages incurred by Barton (and exceed Chenoweth's damages as well). Under the PSLRA, therefore, CMI is presumed to be the most adequate plaintiff. 15 USC § 78u–4(a)(3)(B)(iii)(I). Aggregation for the purpose of invoking the presumption is unnecessary in this scenario.

But the presumption is a rebuttable presumption. 15 USC § 78u–4(a)(3)(B)(iii)(II). The legislative history of the PSLRA indicates that the presumption was an effort by Congress to encourage the involvement of institutional investors in securities class actions. See House Conference Report No. 104–369, 104th Cong. 1st Sess. at 34 (1995); see also *Gluck,* 976 F.Supp. at 548. Congress found, and most courts would agree, that institutional plaintiffs are better equipped than individuals to serve as lead plaintiffs. Institutional plaintiffs, quite simply, have greater resources and more experience of the kind beneficial for selecting counsel and monitoring class action litigation. Because no institutional investors are involved in this case, the primary objective of the presumption is absent. Indeed, the presumption is only meant to favor the plaintiff with the largest financial interest; it was not intended "to obviate the principle of providing the class with the most adequate representation * * *." *Wenderhold,* 188 F.R.D. at 585 (quoting *In re Oxford Health Plans, Inc.,* 182 F.R.D. 42, 49 (S.D.N.Y.1998)).

 With this in mind, the court must assess the quality of the fee agreements negotiated by Barton and CMI. If CMI cannot demonstrate that the deal it negotiated with Milberg Weiss is competitive, then CMI cannot be the most adequate plaintiff. Quite simply, a negotiated deal with the best, competitive terms supports an inference that the negotiating plaintiff is the most adequate plaintiff. Upon review of the arrangements, the court finds that only Barton has negotiated a competitive fee arrangement.

Barton's negotiated fee arrangement with Beattie and Osborn is significantly better for the class than the arrangement between the CMI individuals and Milberg Weiss. Specifically, Barton's arrangement utilizes a descending fee approach with percentages ranging from 15% to 10%, and three caps depending on the total amount of recovery obtained. The percentages in CMI's arrangement, on the other hand, range from 20% to 30%.

Barton's negotiated fee agreement thus has two advantages over CMI's. First, the fees awarded at any level of recovery would be lower in absolute terms. The court calculates that a $15 million recovery would generate a $3.25 million fee under CMI's arrangement, but only a $2 million fee under Barton's arrangement. A $75 million recovery would generate a $20.75 million fee under CMI's arrangement, but just a $7.5 million fee under Barton's arrangement. Clearly, Barton's arrangement preserves a much greater portion of the recovery for the benefit of the class.

A second advantage of Barton's arrangement is the fact that it utilizes a descending percentage approach for calculating the fees. A descending approach enables the class to share in the economies of scale that correspond to increased recovery while increasing percentage agreements deprive the class of these benefits. See *In re Oracle*, 132 F.R.D. at 544.

The court is aware of at least one respected commentator who views ascending percentage fees as advantageous to the class. John C. Coffee, Jr., *Securities Class Auctions*, The National Law Journal (September 14, 1998), Lawrence Decl., Exh C. Professor Coffee reasons that if plaintiff's counsel will receive only a modest proportion of any additional recovery they will be unwilling "to risk the much larger portion of their expected fee award by going to trial to obtain a settlement higher than that level." *Id.* at 3. Putting aside the fact that settlements are not trial recoveries, this view, in the undersigned's opinion, overlooks three important considerations.

First, recoveries in securities class actions of the type at bar are not solely (or even primarily) the product of class counsel's efforts; evidence discoverable, the availability of funding sources such as the amounts and layers of insurance coverage and other factors wholly independent of class counsel's efforts determine recoveries to a much greater extent. This means that counsel often do not have to work harder to achieve a greater recovery, making the extra incentive of an increasing fee unnecessary. Second, and related, because counsel often do not

have to work harder for an increased fee, an increasing percentage fee arrangement amounts to a windfall for counsel. Finally, to the extent greater efforts are needed to capture an increased fee and those efforts are not fully compensated by a decreasing percentage fee, counsel's professional obligation to achieve the best outcome possible for the class prevents a cheap settlement. A sell-out for less than a reasonable settlement seriously jeopardizes counsel's professional standing. Professor Coffee's fears, at bottom, reflect serious doubts about the ethics of plaintiffs' lawyers, doubts to which the undersigned does not subscribe. The case for increasing percentages seems to overlook the importance of these factors.

Because of the comparative extravagance of the fees it proposes, CMI has failed to demonstrate that it has negotiated a reasonably competitive fee arrangement. The significant differences in potential attorney fees cannot be rationally explained by intangible factors such as the well-recognized brand name in securities litigation of CMI's counsel. Accordingly, the court concludes that CMI cannot meet the adequacy requirement of the PSLRA and FRCP 23(a)(4). The presumption invoked by the CMI individuals is, therefore, rebutted.

Barton's arrangement, of course, is not free of imperfections. There are some discontinuity problems due to the relationship between the three caps and three fee percentages. For example, while a $20 million recovery would generate a fee capped at $2 million, a recovery of $20,000,001 would generate a fee slightly greater than $2.4 million. In addition, under Barton's arrangement, expenses are paid out of the class' recovery. CMI's agreement, which obligates Milberg Weiss to cover all expenses, motivates the firm to keep costs down. Based on the court's experience, however, expenses generally do not greatly exceed $500,000, or are often capped at such an amount in any event. So the failure to include expenses in the Barton proposal does not significantly diminish the rather large comparative advantage to the class of Barton's fee proposal.

The competition between law firms in Barton's negotiations, therefore, may not have

been as robust as the court would desire. A competitive bidding process might prompt more intense competition among firms interested in representing the class. In this regard, at least one law firm currently uninvolved in the case has expressed an interest in participating in the process should the court find it necessary. See Letter from James M. Finberg (Doc. # 56). But the court does not find such intervention to be necessary.

Barton's clearly superior fee arrangement demonstrates that he adequately negotiated with counsel. Because the terms of his agreement are competitive, it is as if Barton sought out and compared alternative law firms. Such a market-based transaction should not be disturbed. See *In re Continental Illinois Sec. Lit.*, 962 F.2d 566, 572 (7th Cir.1992) ("Markets know market values better than judges do."). Moreover, the court is not seeking to dictate exactly what the attorney fees should be or to make sure that the lead plaintiff negotiated the type of deal that the court would have preferred. Rather, the primary objective of the court at this time is to ensure that the class member appointed as lead plaintiff is one who is going to be actively involved in the litigation. By negotiating a deal far superior to CMI's, Barton has demonstrated the willingness and ability to do this. As a result, the court finds Barton to be the most adequate plaintiff.

CMI argues that it should be appointed lead plaintiff anyway primarily because of the significant benefit that five diverse personalities and skills could bring to the lead plaintiff role. As the court has concluded, however, Barton has demonstrated an ability to negotiate a far superior fee arrangement without the benefit of a group dynamic. Moreover, the human personalities of lead plaintiffs have little bearing in open market securities cases because securities fraud injures anyone involved in the market, no matter how sympathetic and appealing (or otherwise) the plaintiff may be. To the extent Barton and his counsel deem it prudent for more than one plaintiff to testify at trial, they can always call other witnesses (including the CMI individuals, who should because of their large individual stakes have no reluctance to

cooperate). Accordingly, the court concludes that assembling an appealing set of plaintiffs is essentially irrelevant to the lead plaintiff selection decision in this case (a case involving personal injuries or similar damages might be different).

For the foregoing reasons, the court concludes that Barton is "the most capable of adequately representing the interests of class members." 15 USC § 78u–4(a)(3)(B)(i). Accordingly, the court appoints Barton as the lead plaintiff and approves his selection of Beattie and Osborne to represent the class in the consolidated action. This order does not restrict Barton from further negotiating the fee arrangement with Beattie and Osborne, or if Barton determines it would be in the best interest of the class, from deciding to negotiate with alternative counsel.

In light of these findings, Barton's motion to be appointed lead plaintiff and for the approval of Beattie and Osborn as lead counsel (Doc. # 25) is GRANTED. The similar motion of CMI (Doc. # 18) is DENIED. As noted above, Chenoweth's motion on this matter (Docs. # 26 and 27) is likewise DENIED.

### V

### A

█ In *Quintus,* six individuals seek to be named lead plaintiff as part of one of two groups, either the Cross and Micnaud group or the Quintus Investor group. As discussed above, under the PSLRA, the court must appoint the most adequate plaintiff. 15 USC § 78u–4(a)(3)(B)(i). Two prospective plaintiffs can be eliminated quickly. Cross lacks standing to bring any section 11 claims on behalf of the class arising out of the merger of Quintus and Mustang.com. The court has concluded that creating a sub-class of plaintiffs who acquired Quintus stock through the Mustang.com merger is unnecessary as long as a lead plaintiff (or plaintiffs) who acquired stock both on the open market and through the merger is selected. Cross could not fill this role alone.

█ Micnaud, who has standing to bring claims arising from the Mustang.com merger, failed completely to demonstrate adequa-

cy. Not only did Micnaud fail to show up for the hearing on selection of lead plaintiff, he declined even to respond to the court's inquiries in its February 16, 2001, order (Doc. # 50). Counsel for Micnaud noted that the declarations requested by the court are not mandated by the PSLRA. But the PSLRA and FRCP 23(a)(4) require an adequate class representative and a plaintiff who refuses to answer 10 simple questions related to his interest in this litigation cannot be counted on to monitor complex litigation.

Consequently, the court DENIES the motion by Cross and Micnaud to be appointed lead plaintiffs (Doc. # 8–1). Because the court has not selected Cross and Micnaud to be lead plaintiffs, their motion to appoint their selected counsel to be lead counsel (Doc. # 8–2) must also be DENIED. This does not, however, preclude Weiss & Yourman from consideration if the court finds it necessary to receive bids from prospective lead counsel.

■ Thus, one group consisting of four individual plaintiffs remains in consideration. The court previously stated its belief that aggregation for purposes of invoking the statutory presumption based on financial interest is permissible only (1) if intra-class periods make it impossible for a single plaintiff to represent the class adequately or (2) if the group of investors, functioning as a group, is more capable than any single plaintiff at exercising effective control over the litigation consistent with the requirements of FRCP 23 and the goals of the PSLRA. 2/16/01 *Quintus* order (Doc. # 50) at 3; 2/05/01 *Copper Mountain* order (Doc. # 44) at 3; *Wenderhold*, 188 F.R.D. at 586.

In this case, aggregation for purposes of invoking the statutory presumption is unnecessary. All of the Quintus Investors suffered greater losses than Cross and Micnaud. Furthermore, the court has found Cross and Micnaud inadequate. As a result, there is no need to aggregate the Quintus Investors for purposes of the presumption.

■ Of the four prospective lead plaintiffs, only Hill and Mulcair bought both Quintus and Mustang.com shares. Because only Hill and Mulcair will therefore be able to represent all members of the class, the court will consider only these two plaintiffs. Of the two, Mulcair appears to have suffered the greater loss. See Lawrence Decl. (Doc. # 49), Exh A, at 1. Under the PSLRA, Mulcair is thus presumed to be the most adequate plaintiff. 15 USC § 78u–4(a)(3)(B)(iii)(I). Mulcair, however, is the one "Quintus Investor" unwilling to serve as lead plaintiff individually. See Transcript of March 8, 2001, hearing at 11:15–20. For this reason, Mulcair is inadequate and the presumption is rebutted.

■ Hill cannot meet the adequacy requirement of FRCP 23(a)(4) unless he has demonstrated that he is able effectively to select and negotiate with a prospective lead counsel. Hill's declaration states that he chose Bull & Lipshitz as counsel based on his broker's advice and after conversations with lawyers at the firm. Hill Decl. (Doc. # 60) at ¶ 4, 5. Hill also states that he "discussed and considered a variety of fee structures with [his] counsel and [has] developed an understanding of how fees are customarily charged in litigation of this type." *Id.* at ¶ 6. He further states: "I have negotiated an agreement with counsel regarding an ascending fee structure that I believe will maximize a recovery for the class." *Id.*

The declaration gives the appearance that some selection and negotiation occurred, but it provides no specifics. No mention is made of other firms considered, other fees considered or reasons for rejecting other fees. Most importantly, any notion that competitive negotiations occurred between any of the proposed plaintiffs and counsel is undermined by statements made at the hearing by one of the lawyers representing Hill. The lawyer stated that the fee negotiated by plaintiffs paid expenses out of the class' recovery, rather than out of counsel's portion of the recovery. He went on to explain, however, that counsel, of their own accord, had decided to sweeten the terms of the agreement and allow expenses to be deducted from counsel's share of the recovery, pending approval by plaintiffs who did not know about this concession.

While counsel's benevolence toward the class is commendable, the court cannot con-

clude that plaintiffs negotiated anything close to a competitive fee in light of counsel's willingness to modify the fee, without even being asked, to require counsel to pay all litigation expenses. Benevolence of counsel is no substitute for hard bargaining.

Not only does it appear that plaintiffs did not actually negotiate a competitive fee arrangement, but it appears that plaintiffs lack the interest in the litigation necessary to negotiate a competitive agreement even if given another opportunity, as in *In re Network Associates,* 76 F.Supp.2d 1017. As noted above, no proposed lead plaintiff attended the hearing. This was in sharp contrast to the proceedings in *Copper Mountain.* In that case, seven prospective lead plaintiffs attended the hearing and spoke to the court about their interest in serving as lead plaintiff. In addition to lacking the interest to serve as lead plaintiff, it is unclear whether Hill has the ability effectively to negotiate with prospective class counsel. Hill states: "I consider myself a sophisticated investor who has been actively involved in the stock market since 1987." Hill Decl. (Doc. # 60) at ¶ 2. Hill also states that he is the director of a brokerage firm. *Id.* These qualifications would undoubtedly serve him well as lead plaintiff. But there is no indication that Hill has any experience negotiating with lawyers. While prospective plaintiffs in *Copper Mountain* told the court about their experience negotiating with attorneys, no information of this sort was presented by Hill or the other Quintus Investors.

■ Consequently, the court concludes that Hill is unable to negotiate a competitive fee arrangement with prospective class counsel. Mulcair, the other Quintus Investor who has standing to bring both the section 10 and section 11 claims, appears similarly deficient. Faced with two possible lead plaintiffs, neither one of whom appears to have the interest or ability competitively to select and negotiate with counsel, the court sees no reason to allow an aggregation of plaintiffs to serve as lead plaintiff in this case.

■ Because the court has concluded that none of the lead plaintiffs is adequate, the court is left with two options: (1) decline to appoint any lead plaintiff, finding them all inadequate; or (2) appoint Hill as a nominal plaintiff and then intervene in the selection of counsel. Because this case appears well suited to proceed as a class action, the court concludes that declaring it unsuitable for certification under FRCP 23 would be premature. This leaves only option number two. Consequently, the court appoints Colin Barry Hill as nominal lead plaintiff, thereby GRANTING in part and DENYING in part the Quintus Investors' motion for appointment of lead plaintiff (Doc. # 19–1). The Quintus Investors' motion for appointment of counsel (Doc. # 19–2) is DENIED.

B

In the February 16, 2001, order, the court mentioned the possibility of engaging a special master to oversee the process of selecting lead counsel. The parties, however, have not embraced this idea, apparently believing the risk of the court prejudging the case if it engages in the selection process to be minimal. In the absence of concerned parties, the court will not deviate from its past procedures and will supervise the selection of counsel itself.

■ Toward this end, any counsel interested in serving as lead counsel for the class in this action should submit a proposal to the court by May 14, 2001. The proposals may be filed ex parte and under seal. Joint proposals will not be considered but lead counsel will be allowed to out source work to other firms and lawyers. The proposals should set forth:

1. The firm's experience in securities class action litigation, the terms and fee arrangements under which past representation took place and the background and experience of those lawyers in the firm who, it is anticipated, will be engaged in representing the class in the present litigation;

2. The firm's insurance coverage for malpractice;

3. Evidence that the firm has evaluated the case, including specifically the range and probability of recovery;

4. The percentage of any recovery the firm will charge as fees and expenses for all work performed in connection with the case. This should be set forth on the Fee Schedule Grid, affixed to this order as Appendix B. The proposal should also include an explanation of why the fee arrangement was chosen including a discussion of the increasing or decreasing nature of the fee structure as well as the importance of the changes in percentage of recovery based on the size of recovery and the stage of the litigation at which recovery occurs; and

5. A certification on behalf of the firm that: (a) its proposal was prepared independently of any other firm, entity or person not affiliated with the firm, (b) no part of the proposal was disclosed to anyone outside the firm prior to filing with the court and (c) the proposal was prepared without direct or indirect consultation with other firms that have filed actions on behalf of the proposed class in this matter, or entered an appearance in any fashion.

In sum, the Quintus Investors' motion to appoint lead plaintiff (Doc. # 19–1) is GRANTED in part and DENIED in part. The Quintus Investors' motion for appointment of counsel (Doc. # 19–2) is DENIED. Cross and Micnaud's motions for appointment of lead plaintiff (Doc. # 8–1) and for appointment of lead counsel (Doc. # 8–2) are DENIED. The Harrer group's motions (Docs. # 12–1 & 12–2) were withdrawn and are thus DENIED as moot.

Additionally, the clerk is directed to terminate Quintus' motion to expedite selection of lead plaintiff (Doc. # 34–1) and Cross' motion to file a brief and declaration under seal (Doc. # 57).

## VI

In *Copper Mountain,* all of the prospective lead plaintiffs have shown a good deal of interest in the litigation. All of the prospective plaintiffs submitted declarations and attended the March 8 hearing. Furthermore, one of the plaintiffs, Quinn Barton, appears to have negotiated a reasonably competitive fee arrangement. As a result, the court appoints Barton and approves his selection of counsel.

In contrast, in *Quintus,* the court is faced with disinterested, figurehead plaintiffs. One of them did not respond to the court's inquiries and none was present at the March 8 hearing. Only two acquired Quintus shares on the open market and through the merger. These two plaintiffs, however, have presented little evidence that they negotiated a competitive fee arrangement or have the incentive and ability to do so. Consequently, in *Quintus,* the court has appointed plaintiff Hill but will select counsel using competitive bidding.

IT IS SO ORDERED.

Appendix A:

Lead Plaintiff Inquiry

1. Did you investigate the legal or factual basis of the claims asserted in your complaint or did you rely solely on counsel to do this?

2. Did you seek out counsel or did counsel or someone else seek out you to serve as representative plaintiff?

3. Did you contact any lawyers other than your present counsel about this action and, if so, whom did you contact and when did you do so?

4. What did you do to negotiate a fee and expense reimbursement arrangement that promotes the best interests of the class?

5. What arrangements do you have with proposed class counsel concerning their fees and expenses?

6. What benchmarks do you have in place to measure class counsel's performance during the progress of the litigation?

7. How do you plan to monitor class counsel's conduct of the litigation?

8. Do you have any prior business, professional, family or other relationships with proposed class counsel and, if so, what are those relationships?

9. What prompted you to purchase or sell the securities at issue here on the dates on, and at the prices at, which those transactions were made?

10. Did you make inquiry or do you know whether any intermediaries through whom you made your transactions in the securities at issue have any business, professional, family or other relationships with proposed class counsel?

Appendix B:

Fee Schedule Grid

Fees and Expenses as a Percentage (%) of Total Class Recovery

| | From Pleading Through Motion to Dismiss | After Motion to Dismiss Through Summary Judgment | After Summary Judgment Through Trial Verdict | After Trial Verdict Through Final Appellate Determination |
| --- | --- | --- | --- | --- |
| $0– $4,000,000 | | | | |
| $4,000,001– $8,000,000 | | | | |
| $8,000,001– $15,000,000 | | | | |
| $15,000,001– $20,000,000 | | | | |
| Over $20,000,000 | | | | |